UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LOCAL 705 INTERNATIONAL BROTHERHOOD OF TEAMSTERS PENSION FUND, et al., <br><br> Plaintiffs, <br><br> v. <br><br> MARINA CARTAGE, INC., <br><br> Defendant. | No. 17 CV 29 <br><br> Judge Manish S. Shah |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs are employee-benefit trust funds and their trustees suing defendant Marina Cartage, Inc., for a violation of the Labor Management Relations Act, 29 U.S.C. § 141, *et seq*. Marina Cartage's collective bargaining agreement with the Local 705 International Brotherhood of Teamsters restricts its ability to subcontract work, and plaintiffs allege that Marina Cartage breached those restrictions. The parties cross-move for summary judgment. For the reasons explained below, Marina Cartage's motion is granted.

**I.   Legal Standards**

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute as to a material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant bears

the burden of establishing that there is no such dispute. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"The ordinary standards for summary judgment remain unchanged on cross-motions for summary judgment: [courts] construe all facts and inferences arising from them in favor of the party against whom the motion under consideration is made." *Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017). "Cross-motions must be evaluated together, and the court may not grant summary judgment for either side unless the admissible evidence as a whole—from both motions—establishes that no material facts are in dispute." *Bloodworth v. Vill. of Greendale*, 475 Fed.App'x 92, 95 (7th Cir. 2012).

## II. Facts

Marina Cartage primarily provides intermodal trucking services, meaning it transports shipping containers arriving from railroads and shipping ports. [39] ¶ 7.[1] Marina Cartage entered into a series of collective bargaining agreements with Teamsters Local 705, including two relevant addenda. [39] ¶ 8. The CBA generally requires Marina Cartage to use employees represented by the union (usually, drivers) when performing covered work, which includes picking up and dropping off trailers. [39] ¶¶ 10–11. Relatedly, Marina Cartage is generally prohibited from subcontracting

---

[1] Bracketed numbers refer to entries on the district court docket. Page numbers are taken from the CM/ECF header at the top of filings. The facts are taken from the parties' statements of material facts and responses to each other's statements. *See* [39] (Marina Cartage's response to plaintiffs' statement of facts); [41] (plaintiffs' response to Marina Cartage's statement of additional facts); [42] (plaintiffs' statement of additional facts). Marina Cartage did not respond to plaintiffs' statement of additional facts, so I consider those facts to be admitted. *See* Local Rule 56.1.

covered work to others. [39] ¶ 12. Subcontracting is defined broadly to include work "subcontracted, transferred, leased, diverted, assigned or conveyed in full or in part" by Marina Cartage to any other "plant, business, person or non unit Employee," even if owned or controlled by Marina Cartage. [39] ¶ 12. However, the subcontracting provision has two exceptions to the general prohibition. First, Marina Cartage "may subcontract overflow loads when all of [its] Employees are working," as long as certain conditions are met, including "that subcontracting shall not be used as a subterfuge to violate [the CBA], or to avoid hiring additional Employees to operate existing equipment or obtaining additional equipment to be operated by them or existing Employees." [39] ¶ 12. Second, Marina Cartage "may subcontract overflow loads when all [its] employees on the seniority list are working," with no stated conditions. [39] ¶ 12.

The CBA requires Marina Cartage to make a specified weekly contribution to the plaintiff funds for each union employee. [39] ¶ 9. In August 2008, Marina Cartage reported and paid contributions for nine employees. [39] ¶ 24. In January 2014, the number of reported employees declined to three employees, and since June 2015, Marina Cartage has reported and paid contributions for just one employee—its owner and manager, Michael Tadin. [39] ¶ 24; [37] at 3.

In April 2016, a union business agent told plaintiffs that he had seen non-union people driving Marina Cartage trucks, and in response, plaintiffs initiated a compliance audit of Marina Cartage's payroll records for the period of January 1,

3

2014 to December 31, 2016. [39] ¶ 22.[2] The audit revealed that Marina Cartage had paid third-party companies for certain services during the audit period. [39] ¶ 25. The invoices underlying the payments listed descriptions of the work, including "delivered container [address] to railport" and "move boxes from CSX Bedford Park to railport." [32-1] at 284, 286–95. Other invoices described services like "spotting at railport" and transporting loads of dirt. [32-1] at 283, 300–06.

**III.   Analysis**

Plaintiffs bring suit as third-party beneficiaries of the collective bargaining agreements, alleging that Marina Cartage's use of subcontractors breached the collective bargaining agreements.[3] *See* 29 U.S.C. § 185 (conferring federal jurisdiction over breaches of CBAs). The question is largely one of contract interpretation, a task well-suited for resolution on summary judgment. *See Hanover Ins. Co. v. N. Bldg. Co.*, 751 F.3d 788, 791 (7th Cir. 2014).

   **A.   Whether Marina Cartage Subcontracted**

Though Marina Cartage agrees that it "subcontracted or otherwise retained the services of [ ] [s]ubcontractors to transport materials to and from various locations in the Chicago area," it argues that "the transactions did not constitute subcontracting as described in the collective bargaining agreement." [39] ¶ 33. The CBA defines subcontracting as "operation, work or services of the kind, nature or type

---

[2] Marina Cartage objects to the business agent's allegation as hearsay, but the allegation is not offered to prove that Marina Cartage used non-union drivers but rather to explain what prompted the audit.

[3] Plaintiffs initially brought an ERISA claim, but plaintiffs have chosen to drop that claim. *See* [33] at 6; [40] at 4.

covered by, or presently performed by, or hereafter assigned to the collective bargaining unit by [Marina Cartage]" being "subcontracted, transferred, leased, diverted, assigned or conveyed in full or in part by [Marina Cartage]" to others. [39] ¶ 12.

The parties agree that the CBA covers drivers "who are dispatched to pick up or terminate a trailer, whether to or from Marina's facility or to or from other locations." [39] ¶ 11. Picking up or terminating trailers qualifies as work "covered by, or presently performed by, or hereafter assigned to the collective bargaining unit by [Marina Cartage]." [39] ¶ 12. If Marina Cartage subcontracted or assigned that kind of work to others, it falls within the scope of the CBA's subcontracting provision. Plaintiffs list six companies that Marina Cartage subcontracted services to—Pier Transportation, Quality Truck & Trailer Repair, JEI Transportation, Camion Cartage, Efficient Trucking, and Tomahawk Trucking—mostly backed up by invoices describing the services provided. [39] ¶¶ 26–31. Marina Cartage does not dispute that it paid these companies for services, but it disputes that the services were within the scope of the CBA.

According to Tadin, Marina Cartage hired Pier Transportation, Quality Truck & Trailer Repair, and JEI Transportation[4] to perform "spotting" services. "Spotting" involves the storage and maintenance of trailers not in use, including "rotating and

---

[4] Plaintiffs do not offer invoices for JEI Transportation's work and relies instead on a Marina Cartage email listing the names of "brokers" it used during the relevant time period, [39] ¶ 30, and Tadin's affidavit statement that he "[has] brokered some trailer spotting to [JEI Transportation]." [37] at 5; [42] ¶ 2.

5

moving their locations." [37] at 5; [42] ¶ 2. Moving trailers in this way meets the agreed definition of covered work because it requires drivers to pick up and terminate trailers from one location to another.[5] Tadin concedes that he paid Camion Cartage to pick up empty trailers and return them to the railyard for reloading, [37] at 5–6; [42] ¶ 3, which also qualifies as covered work. But Efficient Trucking and Tomahawk Trucking are dump-truck companies. [37] at 6; [42] ¶¶ 4–5. Marina Cartage hired the former to deliver loads of stone and the latter to dump contaminated dirt. [37] ¶¶ 6–7; [42] ¶¶ 4–5. Neither of those involve picking up or dropping off trailers. Plaintiffs point out that Marina Cartage claims ownership of "[o]ne of the largest dump truck fleets in the area," [42] ¶ 6, but that is not relevant to the parties' agreed definition of covered work.

Marina Cartage characterizes its subcontracting as "act[ing] as a broker providing the work, collecting from the shipping customers, and earning a fee," [39] ¶ 25, and states that it "did not control the manner or means of delivery or directly compensate the drivers who did the work." [39] ¶ 33. Marina Cartage points to no language in the CBA requiring an element of control or direct compensation for conduct to be considered subcontracting. Marina Cartage assigned CBA-covered work

---

[5] Marina Cartage argues that all six companies' services did not involve intermodal freight services, [39] ¶¶ 26–31, but Marina Cartage did not demonstrate that the CBA only covers intermodal freight services. Instead, Marina Cartage did not dispute plaintiffs' statement that picking up and terminating trailers is covered by the CBA, other than to say the service is not limited to the Chicago area. *See* [39] ¶ 11. So, whether a company performed intermodal freight work is immaterial.

6

to four companies, so whether it labels that conduct "brokering" or something else, it meets the CBA's broad definition of subcontracting.

## B. Whether the CBA Permitted the Subcontracts

The question remains whether Marina Cartage was allowed to subcontract this CBA-covered work. The parties base their positions on two different exceptions to the CBA's subcontracting prohibition. Plaintiffs focus on the first exception, which allows Marina Cartage to subcontract overflow work when all its employees are working as long as certain conditions are met, and contends that Marina Cartage did not meet those conditions. [39] ¶ 12. But Marina Cartage justifies its subcontracting by pointing to the second exception, which allows it to subcontract overflow work when all its employees on the "seniority list" are working, with no conditions. [39] ¶ 12. Marina Cartage asserts that the employees on the seniority list were all working, and plaintiffs do not argue that subcontracting took place when any of Marina Cartage employees on the seniority list were not working. There is no dispute that the subcontracted work was overflow, so by the plain language of the seniority-list exception, Marina Cartage was permitted to subcontract the work without fulfilling any additional requirements.

Plaintiffs did not grapple with the seniority-list exception in their briefing. At oral argument, they argued that the court should read the conditions from the first exception as applying to the seniority-list exception. There is arguably some tension between the two exceptions, since the first exception would only apply in the absence

of a seniority list.[6] But Marina Cartage explained at oral argument that an employer could theoretically not have a seniority list, so the two exceptions are not inconsistent. Therefore, the contract's language is unambiguous, and "[t]he courts are not 'free to cast aside the agreed upon terms' of a contract." *Grun v. Pneumo Abex Corp.*, 163 F.3d 411, 421 (7th Cir. 1998) (citation omitted). Nor is there any evidence that this is "the rare case where literal application of a text would lead to absurd results or thwart the obvious intentions of its drafters." *Id*. Applying the unambiguous language of the CBA that allows Marina Cartage to "subcontract overflow loads when all [its] employees on the seniority list are working," [39] ¶ 12, I find that Marina Cartage's subcontracting did not breach the CBA as a matter of law, and it is entitled to summary judgment.[7]

---

[6] Whenever all employees are working (so that the conditional exception applies), necessarily all employees on the seniority list would be working because they are a subset of all employees. In that situation, the seniority-list exception would allow for overflow subcontracting without any conditions. But if it is possible for an employer to have employees not on a seniority list, then it is possible for the first exception to apply and the second one to not apply. Although likely a rare situation, the provisions can exist without one being surplusage.

[7] Plaintiffs would not have prevailed even if I had accepted their contention that the conditions applied. Plaintiffs argue that Marina Cartage's subcontracting constituted "a subterfuge in clear violation of the proviso to the subcontracting clause," [33] at 9, but they did not offer evidence from which a factfinder could reasonably infer that Marina Cartage's failure to hire new workers was done with the intent implied by the term "subterfuge." The reduction in Marina Cartage's workforce could be explained by other competitive forces, and an intent to avoid compliance with the CBA is not the only possible inference.

## IV. Conclusion

Plaintiffs' motion for summary judgment [31] is denied. Marina Cartage's motion for summary judgment [35] is granted. Marina Cartage's motion to strike [34] is terminated as moot. The clerk shall enter judgment on the merits in favor of Marina Cartage. Marina Cartage may submit a petition for attorneys' fees using the procedure provided by Local Rule 54.3. Terminate civil case.

ENTER:

Manish S. Shah
United States District Judge

Date: February 11, 2019